**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHERYL LEVINE | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO. 14-7050 |
| LIFE INSURANCE COMPANY OF | : | |
| NORTH AMERICA, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

**Rufe, J.**                                              **April 21, 2016**

Currently pending before the Court are Plaintiff Cheryl Levine's and Defendant Life

Insurance Company of North America's cross-Motions for Summary Judgment.  For the

following reasons, Plaintiff's Motion will be granted and Defendant's Motion will be denied.

## I.    FACTUAL BACKGROUND

### A.    The Disability Plan

On December 12, 2014, Plaintiff initiated the current litigation based on Defendant's

denial of short-term disability benefits under an employee welfare benefit plan governed by the

Employee Retirement Income Security Act ("ERISA").[1]  Her Complaint seeks short-term

disability benefits under the benefit plan (the "Plan") in which Plaintiff participated through her

employment as a Hospital Account Manager with Quest Diagnostics ("Quest").  The parties

agree that, at all relevant times, Plaintiff was a covered beneficiary under the Plan.

The Plan is a Group Insurance Policy—identified as Policy F.L.K. 908830—established

by Quest Diagnostics for its employees and issued by Defendant Life Insurance Company of

---

[1] 29 U.S.C. § 1132(a).

North America ("Cigna" or "Defendant") to Quest.[2]  The Plan provides for twenty-six weeks of short-term disability payments following a fourteen-day benefit waiting period.[2]  The benefits end either when the disability ends or when the benefits are no longer payable, whichever comes first.[3]   Cigna is the "named fiduciary for deciding claims for benefits under the Plan, and for deciding any appeals of denied claims."[5]  When a claim is denied, the claimant has a right to appeal.[6]  No deference is given to the original claim decision, and the appeal is not heard by either the person who made the initial claim decision or a subordinate of that person.[7]

**B.**   **Plaintiff's June 11, 2013 Claim Under the Plan**

At the time of her initial claim, Plaintiff was sixty years old.[8]  Approximately five years earlier, Plaintiff's son, Seth, had been involved in a car accident and suffered serious leg injuries that required multiple surgeries.[9]  On May 31, 2008, while Seth was still in the hospital, he passed away as a result of what Plaintiff believed to be medical negligence.[10]  Plaintiff ultimately sued the hospital, and the matter settled.[11]  Seth's death triggered a "deep, profound and lasting

---

[2]  Administrative Record ("A.R.") 000745–000806.

[2]  Id. at 000750–51.

[3]  Id. at 000757.

[5]  Id. at 000769.

[6]  Id. at 000770.

[7]  Id.

[8]  Id. at 000001.

[9]  Id. at 000022, 000179.

[10]  Id. at 000131, 000642.

[11]  Id. at 000583.

depression" that purportedly worsened over the years.[12]  By June 2013, Plaintiff believed she was

no longer able to substantively function either with her daily activities or at work with Quest.[13]

On June 11, 2013, Plaintiff called in a claim to Cigna that she was unable to work due to

depression, anxiety, headaches, and difficulty concentrating.[14]  A Cigna behavioral health

specialist ("BHS") documented their call, as follows:

> Cx [claimant] reports that in 2008 she lost her only child.  Cx states that she has
> received a lot of support from Compassionate Friends.  Cx states it has been very
> difficult.  She states that this is the fifth anniversary of his death.  She states that there
> are also a lot of changes at work.  Has been with Quest for 20 years.  Cx states she
> is a hospital service representative and at times has difficulty going into the hospital
> because she states son died due to hospital negligence.  Cx states that there is a lot
> of expectation with job.  Cx states she has sleeplessness and anxiety, panic attacks.
> Cx states she has difficulty driving not due to panic but states when she leaves a
> hospital at times she is so angry at hearing things that to her are inconsequential she
> cannot drive and do another hospital visit because of her anger and depression that
> she is the one who lost a son.  Cx states that she is depressed, angry and gets irritable.
> Cx states that she feels hopeless, feels amotivated.  Cx states that she does not care
> if she wakes up at all.  Cx states she is not going to hurt self but just does not care.
> Cx states that initially she did a lot of things in her son's name to help her with her
> grief but states that is [sic] never goes away.

> Restricting provider—Dr. Jalil, PCP and Dr. Wittman, Ph.D.  Cx states that she is on
> anti-depressant—lexapro and diazepam.  Cx states that she has called a psychiatrist
> to see if maybe a different medication—has not heard back yet.  Cx states that she
> uses a support group as well.  NOV with Dr. Wittman is 7/19/13.  Sees therapist q
> 3 weeks.  NOV with Dr. Jalil is end of July.

> Medically, cx reports that she is stable.  No drug/alcohol use.

> Cx states that she is smoking more as a result of her pent up anger and anxiety.

> Cx states that she got a puppy, does some volunteer work, tries to help a neighbor

---

[12]  Compl. ¶ 13.

[13]  Id. ¶ 15.

[14]  A.R. 000255.

who is ill and who has triples all on the autism spectrum.  Cx states that going to work brings up a lot of anxiety.  RTW plan—cx has no plans.

MD guidelines given to cx.  BHS explained she would f/u with therapist and asked cx to call her with name of psychiatrist.[15]

Cigna notified Plaintiff on July 17, 2013 that her Short Term Disability ("STD") benefits were approved through August 5, 2013.[16]   By letter dated September 11, 2013, Cigna then informed Plaintiff that her benefits were terminated effective August 5, 2013.[17]  In that letter, Cigna indicated that a BHS had spoken with Carol Wolf Wittman, Ph.D., Plaintiff's treating psychologist, on August 30, 2013, and September 4, 2013.[18]  The BHS remarked, in pertinent part, that "[w]hile Dr. Wittman does note that she is restricting you from working, she does not provide any additional clarity with regard to symptom frequency, intensity or duration.  And although she did note that you are anxious and depressed, Dr. Wittman did not provide any specific symptoms in order to indicate the severity of the condition."[19]  The BHS's notation went on to remark that

> Dr. Wittman noted that you cannot drive on a regular basis; however, she previously noted that you had been able to drive to all of your appointments, are able to shop when needed, and are able to visit friends and neighbors.  Additionally, your current treatment is not consistent with stated severity of symptoms.  Dr. Wittman reported that you are seen bi-weekly and are attending a support group on a regular basis. However, no referrals have been made to change the level of care to a more intense

---

[15] Id. at 000131.

[16] Id. at 000327.

[17] Id. at 000316–17.

[18] Id. at 000317.

[19] Id.

level of treatment.[20]

Cigna also indicated that it sent a medical request to Plaintiff's primary care physician and Plaintiff's psychiatrist, Jeffrey Herman, D.O.[21]  As of September 10, 2013, however, Dr. Herman's office had provided no medical records.[22]

Plaintiff immediately appealed the September 11, 2013 decision.[23]  Plaintiff provided a letter description of her difficulties, as well as records from Dr. Herman, in which he described Plaintiff as "depressed, irritable, tearful, [and] anxious" and opined that Plaintiff's "random panic attacks, crying spells, anxiety while driving, distracted, irritable with others, decreased focus, [and] depressed mood" would prevent Plaintiff from making a safe return to work.[24]

Nonetheless, on October 2, 2013, Cigna affirmed its decision to discontinue Plaintiff's benefits after August 5, 2013.[26]  On October 29, 2013, Plaintiff filed her second appeal of Cigna's denial of short-term disability benefits,[27] and Cigna requested additional records from Dr. Herman and Dr. Wittman.[28]  During the pendency of her appeal, Plaintiff obtained legal counsel from Lawrence Weinstein, Esq., who argued that Cigna improperly discounted the

---

[20] Id.

[21] Id.

[22] Id.

[23] Id. at 000310.

[24] Id. at 000682.

[26] Id. at 000307–09.

[27] Id. at 000668.

[28] Id. at 000297, 000299.

medical providers' treatment notes and records illustrating Plaintiff's continued depression.[29] Mr. Weinstein also submitted letters and additional medical records from Drs. Herman and Wittman.[30]  On February 21, 2014, Cigna sent a letter to Mr. Weinstein indicating that it had reviewed the letter of appeal and the additional medical records, but was affirming its decision to discontinue benefits.[31]

On August 13, 2014, new counsel, Lance Rosen, Esq., filed a third appeal on behalf of Plaintiff.[32]  Mr. Rosen submitted a letter of appeal, as well as several additional medical records including: (1) Dr. Herman's contemporaneous office notes from March through June, 2014; (2) Dr. Wittman's narrative letter and accompanying Mental Impairment Questionnaire dated August 4, 2014; and (3) Andrew Wolanin, Psy.D.'s psychological assessment dated April 28, 2014.[33]  In a letter dated September 25, 2014, Cigna stated that an "Appeal Senior Associate" and a "Nurse Case Manager" had reviewed the additional medical treatment records and again affirmed Cigna's decision.[34]  Cigna's claim notes reveal that Rafael Ruiz, M.D., a psychiatrist,[35] also reviewed Plaintiff's claim file in its entirety and opined to a reasonable degree of medical

---

[29]  Id. at 000281–84.

[30]  Id. at 000615.

[31]  Id. at 000281–84.

[32]  Id. at 000560–63.

[33]  Id.

[34]  Id. at 000261–63.

[35]  Plaintiff argues that nothing in the record indicates that Ruiz is a physician, let alone a psychiatric physician.  The record, however, clearly lists Dr. Ruiz as "Rafael Ruiz, MD, Board Certified Adult Psychiatrist, Licensed Physician."  Id. at 000019.

certainty that the record did not support "the presence of a mental impairment of a severity sufficient to necessitate restriction from work."[36]  Plaintiff then filed this action.

## II.      STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[37]  A factual dispute is "material" only if it might affect the outcome of the case.[39]  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.[40]

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.[41]  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.[42]  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.[43]  If a conflict arises between the evidence presented by the parties, the court must accept as true the allegations

---

[36]  Id. at 000021.

[37]  Fed R. Civ. P. 56.

[39]  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[40]  Id.

[41]  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).

[42]  Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).

[43]  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

of the non-moving party.[44]

"The rule is no different where there are cross-motions for summary judgment."[45]  As stated by the Third Circuit, "'[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'"[46]

## III.   DISCUSSION

### A.   Standard of Review Applicable to the Denial of Benefits

The parties in this case dispute the standard of review applicable to Defendant's denial of benefits.  Plaintiff asserts that a de novo standard of review must apply because the Plan did not specifically provide Cigna with discretionary authority.  Defendant asserts that the Court's review remains restricted to an arbitrary and capricious standard because Defendant retains discretion under the Plan to determine benefits.

The United States Supreme Court has explained that, when evaluating challenges to the denial of benefits, district courts are to review the plan administrator's decision under a de novo standard of review, unless the plan grants discretionary authority to the administrator or fiduciary to determine eligibility for benefits or interpret the terms of the plan.[47]   When discretionary

---

[44] Anderson, 477 U.S. at 255.

[45] Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008).

[46] Id. (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

[47] Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

authority is given to an administrator of a plan, a deferential arbitrary and capricious standard applies to any subsequent judicial review.[48]   No magic words such as "discretion" need be used to accord discretion.[49]   Rather, "[d]iscretionary powers may be implied by a plan's terms even if not granted expressly."[50]   Language implying discretion may even be "sprinkled throughout the plan."[51]   The insurer, however, bears the burden of proving the applicability of a deferential standard of review.[52]   When a plan is ambiguous, it must be construed in favor of the insured.[53]

Discretionary authority "is not conferred by the mere fact that a plan requires a determination of eligibility or entitlement by the plan administrator."[58]   "[A]lmost all ERISA plans designate an administrator who, in order to carry out its duties under the plan, must determine whether a participant is eligible for benefits.  Yet this authority to make determinations does not carry with it the requisite discretion . . . unless the plan so provides."[59]   Thus, a provision designating an insurer as a claim fiduciary "'does not clearly indicate that [the fiduciary] has discretion to interpret the rules, to implement the rules, and even to change them

---

[48] Id. at 111–12; Estate of Schwing v. Lilly Health Plan, 562 F.3d 522, 525 (3d Cir. 2009); Kalp v. Life Ins. Co. of N. Am., No. Civ.A.08-1005, 2009 WL 261189, at *1 (W.D. Pa. Feb. 4, 2009).

[49] Luby v. Teamsters Health Welfare & Pension Trust Funds, 944 F.2d 1176, 1181 (3d Cir. 1991).

[50] Id.

[51] Marx v. Meridian Bancorp, Inc. Long Term Disability Plan, No. Civ.A.99-4484, 2001 WL 706280, at *3 (E.D. Pa. Jun. 20, 2001), aff'd, 32 F. App'x 645 (3d Cir. 2002).

[52] Viera v. Life Ins. Co. of N. Am., 642 F.3d 407, 413 (3d Cir. 2011).

[53] Id.

[58] Elms v. Prudential Ins. Co. of Am., No. Civ.A.06-5127, 2008 WL 4444269, at *13 (E.D. Pa. Oct. 2, 2008) (citing Woods v. Prudential Ins. Co. of Am., 528 F.3d 320, 323 (4th Cir. 2008)).

[59] Woods, 528 F.3d at 323.

entirely . . . .''[60]

The sole provision of the Plan cited by Defendant in support of applying a deferential standard of review states that "[t]he Plan Administrator has appointed the Insurance Company [Cigna] as the named fiduciary for deciding claims for benefits under the Plan, and for deciding any appeals of denied claims."[61]   This provision is insufficient to invoke an arbitrary and capricious standard of review as it does nothing more than designate to the insurer the responsibility for eligibility determinations.  Nothing in this provision can be read to grant discretion to Defendant.  As Defendant has failed to meet its burden of proving the applicability of a deferential standard, its claims decision is subject to a de novo standard of review.

When exercising de novo review, "the role of the court is to determine whether the administrator . . . made a correct decision."[62]   The de novo standard extends to both plan interpretation and factual findings, and the Court is not confined to the record before the Plan

---

[60]  Moran v. Life Ins. Co. of N. Am. Misericordia Univ., No. Civ.A.13-765, 2014 WL 4251604, at *4–5 (M.D. Pa. Aug. 27, 2014) (quoting Viera v. Life Ins. Co. of N. Am., 642 F.3d 407, 418 (3d Cir. 2011)) (further quotations omitted); see also Herzberger v. Standard Ins. Co., 205 F.3d 327, 332 (7th Cir. 2000) ("We hold that the mere fact that a plan requires a determination of eligibility or entitlement by the administrator . . . does not give the employee adequate notice that the plan administrator is to make a judgment largely insulated from judicial review by reason of being discretionary.  Obviously a plan will not—could not, consistent with its fiduciary obligation to the other participants—pay benefits without first making a determination that the applicant was entitled to them."); Life Ins. Co. of N. Am. v. Sorilla, No. Civ.A.14-1797, 2015 WL 3407468, at *3 (D. Ariz. May 27, 2015) (holding that language which merely names an insurer as the "named fiduciary for deciding claims for benefits under the Plan, and for deciding any appeals of denied claims" merely grants the insurer the authority to determine eligibility for benefits and does not unambiguously grant discretion); Mercer v. Life Ins. Co. of N. Am., No. Civ.A.11-372, 2011 WL 4404053, at *4 (W.D. La. Aug. 30, 2011) (holding that the following language did not confer discretionary authority on the insurer to construe plan terms: "The Plan Administrator has appointed [LINA] as the named fiduciary for deciding claims for benefits under the Plan, and for deciding any appeals or denied claims"); see generally Viera, 642 F.3d at 417 (holding that "[t]o be insulated from de novo review, a plan must communicate the idea that the administrator not only has broad-ranging authority to assess compliance with pre-existing criteria, but also has the power to interpret the rules, to implement the rules, and even to change them entirely") (internal quotation marks omitted).

[61]  A.R. 000769.

[62]  Viera, 642 F.3d at 413 (quotations omitted).

administrator.[63]  Stated simply, "[t]he administrator's decision is accorded no deference or presumption of correctness.  The court must review the record and determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan."[64]

### B.    Review of the Denial of Benefits

Having determined the applicable standard of review, the Court now turns to the accuracy of Defendant's decision to deny benefits to Plaintiff under the Plan.  Under the Plan:

> The Insurance Company will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy.  The Employee must satisfy the Elimination Period, be under the Appropriate Care of a Physician, and meet all the other terms and conditions of the Policy.  He or she must provide the Insurance Company, at his or her own expense, satisfactory proof of Disability before benefits will be paid.[65]

The Plan defines"Disability/Disabled" as follows:

> The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
> 1.     unable to perform the material duties of his or her Regular Occupation; and
> 2.     unable to earn 80% or more of his or her Covered Earnings from working in his or her Regular Occupation.
> The Insurance Company will require proof of earnings and continued Disability.[66]

"Sickness" includes "[a]ny physical or mental illness."[67]  In the context of the present case, if the record establishes that Plaintiff was "Disabled" from performing the material duties of her

---

[63]  Luby, 944 F.2d at 1184.

[64]  Viera, 642 F.3d at 413–14.

[65]  A.R. 000759.

[66]  Id. at 000750.

[67]  Id. at 000768.

11

occupation at Quest, she is entitled to benefits.

This Court's thorough review of the entire record under a de novo standard supports a finding of disability under the Plan terms.  The disabling nature of Plaintiff's mental impairments finds ample support in the medical assessments of Plaintiff's treating doctors.  It remains well established that "a plan administrator is not required to give greater weight to the opinions of a claimant's treating physicians than to those of independent medical examiners."[68]  Indeed, "[n]othing in [ERISA] . . . suggests that plan administrators must accord special deference to the opinions of treating physicians."[69]  Nonetheless, administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."[70]  Moreover, "[a]n administrator may not selectively consider and credit medical opinions without articulating its thought processes for doing so."[71]

In this case, Dr. Wittman—Plaintiffs' treating psychologist—rendered multiple assessments regarding Plaintiff's ability to return to her position at Quest.  On July 15 and August 4, 2013, Dr. Wittman completed Behavioral Health Questionnaires indicating that Plaintiff was despondent, lethargic, and had difficulty with focus and sleep.[72]  In both reports, she opined that Plaintiff's depression and grief were "too unmanageable" or "too

---

[68]  Lamanna v. Special Agents Mut. Benefits Ass'n, 546 F. Supp. 2d 261, 289 (W.D. Pa. 2008).

[69]  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003).

[70]  Id. at 834.

[71]  Ricca v. Prudential Ins. Co. of Am., 747 F. Supp. 2d 438, 445 (E.D. Pa. 2010).

[72]  A.R. 000690—92, 000695–97.

pervasive/persistent" for her to focus on work.[73]  Thereafter, in her letter of November 18, 2013, Dr. Wittman remarked that Plaintiff had increased her therapy sessions from twice monthly to weekly, that her sense of hopelessness had grown as she watched her friends going through milestones with their children, that she forced herself to proceed with her day's activities but never feels truly present, and that "[t]he stress of not having to perform in a work setting has decreased her panic but has not affected her overall depression."[74]  On February 3, 2014, Dr. Wittman opined that "I do not see re-entering the work force as a possibility for Ms. Levine.  She suffers from complicated grief as opposed to acute grief.  This form of grief takes over a persons' [sic] mind and does not let go, it does not recede into the background as in acute grief."[75] Finally, on August 4, 2014, Dr. Wittman provided a lengthy letter, accompanied by a Mental Impairment Questionnaire, stating that Plaintiffs "depression and grief are the reasons for her impaired work function.  Her job demanded concentration[,] an upbeat social style and great attention to detail.  Her psychological symptoms prohibit her from fulfilling these demands. They render her inattentive, detached, and disengaged."[76]  The attached Mental Impairment Questionnaire identified Plaintiff's precise signs and symptoms, as well as her specific functional limitations.[77]  Dr. Wittman then went on to conclude that "[b]ased on a consistent diagnosis of Major Depressive Disorder and Complicated Bereavement Syndrome by Dr. Herman and myself

---

[73]  Id.

[74]  Id. at 000627.

[75]  Id. at 000625.

[76]  Id. at 000593–601.

[77]  Id. at 000597–600.

13

and supported by Dr. Wolanin's interview and testing results[,] Ms. Levine is currently significantly functionally impaired.  Her impairment renders her ill equipped to perform responsibilities required by her job."[78]

Consistent with Dr. Wittman, Dr. Herman—Plaintiff's treating psychiatrist— also opined that Plaintiff was unable to return to her previous occupation.  On August 15, 2013, Dr. Herman noted that Plaintiff was on Lexapro and Valium, and only recently stopped Wellbutrin.[79]   He described her as depressed, irritable, tearful and anxious,[80] and ultimately concluded that she could not return to work due to "random panic attacks, crying spells, anxiety while driving, distracted, irritable with others, decreased focus, [and] depressed mood."[81]  Dr. Herman also submitted a letter describing the results of a comprehensive psychiatric evaluation he performed on Plaintiff.[82]  Based on his evaluation, he diagnosed Plaintiff with Major Depressive Disorder due to Complicated Bereavement Syndrome, and Post Traumatic Stress Disorder due to traumatic events leading to her son's death.[83]  He believed that Plaintiff's prognosis remained "guarded at best" because "[s]he has daily reminders of the tragic death of her son."[84]  His

---

[78] Id. at 000594, 000596.

[79] Id. at 000682–83.

[80] Id.

[81] Id.

[82] Id. at 000616.

[83] Id. at 000617.

[84] Id.

professional opinion[85] was "that she does not have the capacity to maintain employment."[86]

Dr. Herman's and Dr. Wittman's extensive treatment notes support their assessments of Plaintiff's condition and paint a longitudinal picture of her limitations.  Dr. Herman remarked in September 2013 that Plaintiff reported doing "horribly" and that she was sick at the thought of working due to her ruminations over her son's death.[87]  Although her speech was clear and her cognition was good, she had a depressed affect and only fair insight and judgment.[88]  In October of 2013, when Plaintiff reported being terminated from Quest after forty years, her mood was depressed and her affect fearful, leading to a continued diagnosis of depression with anxiety and Complex Bereavement Syndrome.[89]  In December 2013, Plaintiff was calm and cooperative with good cognition, insight, and judgment, but suffered from worsened depression.[90]  Moving into 2014, Plaintiff remained depressed, anxious, and guilty, despite spending time with her sister in Florida.[91]  By March, Plaintiff's sister had decided to move in with her for a while to help her with her daily struggles, and Plaintiff requested an increase in her anxiety medications.[92]  In April

---

[85]   Defendant repeatedly emphasizes Dr. Herman's July 11, 2014 remark that because his practice was limited to psychopharmacology, he was not able to do any additional vocational assessments.  Id. at 000565.  Dr. Herman's unwillingness to provide a vocational assessment, however, does not detract from the validity of his previously-provided medical assessments based on his regular treatment and examination of Plaintiff.

[86]  Id. at 000617.

[87]  Id. at 000620.

[88]  Id.

[89]  Id.

[90]  Id. at 000618.

[91]  Id. at 000570.

[92]  Id. at 000569.

and May, Plaintiff completed a walkathon in her son's memory, but still felt "crappy" and wanted to just stay in bed most days.[93]  Dr. Herman observed that her mind was unfocused.[94]  Dr. Herman's final note of record stated: "continues to struggle [with] loss of son.  Everyday is a struggle.  Financial pressures."[95]

Similarly, Dr. Wittman's extensive treatment records reveal that although Plaintiff experienced isolated periods of improvement and activity, she generally suffered from overwhelming depression and anxiety.  In August, Plaintiff's anxiety was manageable "in light of not working."[96]  Notes from September 2013 remarked that Plaintiff's "complicated grief makes it impossible to perform in the professional manner she previously ascribed to" and that her grief and anxiety make her incapable of adapting to change.[97]  Repeatedly, Dr. Wittman commented on Plaintiff's anxiety with change, her complicated grief, and her "engulfing" or "consuming" despair.[98]  During sessions in November and December 2013, Plaintiff reported incredible anxiety over the holidays, fear of change, and living a life of "avoidance."[99]  By 2014, Plaintiff suffered from isolation, but was met with bouts of anxiety when away from her son's

---

[93] Id. at 000567–68.

[94] Id.

[95] Id. at 000566.

[96] Id. at 000633.

[97] Id. at 000632–33.

[98] Id. at 000631–32.

[99] Id. at 000629–30.

belongings.[100]

In addition to the records from Plaintiff's treating providers, the April 28, 2014 report of
independent psychological consultant Andrew Wolanin, Psy.D. bolsters Plaintiff's claim of
disability.[101]  Following referral by Plaintiff's counsel, Dr. Wolanin reviewed the entire record,
including Dr. Herman's notes, letter, and assessments, Dr. Wittman's notes and assessments, and
the claim denial letter from Defendant.[102]  In addition, he conducted a clinical interview with
Plaintiff and performed a battery of psychological testing including: Test of Memory
Malingering, Minnesota Multiphasic Personality Inventory-2 Restructured Form, Beck
Depression Inventory II, PTSD Checklist-Civilian Version, World Health Organization Disability
Assessment Schedule 2.0, Wechsler Adult Intelligence Test-IV, and Trail Making Test A & B.[103]
Based on this examination, Dr. Wolanin diagnosed Plaintiff with Major Depressive Disorder,
Recurrent, Severe, and Persistent Complex Bereavement Syndrome.[104]  With respect to the
relationship between her impairments and her work function, he explained:

> Ms. Levine currently has significant impairment in her ability to function
> appropriately in the duties of her occupation.  Her job as a sales manager for Quest
> Diagnostics requires consistent concentration, attention, detail orientation and
> interpersonal effectiveness.  Ms. Levine's current severe depressive symptoms
> prevent her from performing the required duties of her job, as she has significant
> sadness, anhedonia, poor concentration, poor attention, and rumination about past
> events.  In addition, she has significant difficulties in interpersonal work situations
> as she continues to ruminate about her son's death.  Ms. Levine's depressive and

---

[100]  Id. at 000628.

[101]  Id. at 000582–92.

[102]  Id.

[103]  Id.

[104]  Id.

bereavement symptoms and functional impairment related to her son's death prevent her from performing the duties required by her job duties.[105]

Dr. Wolanin concluded that Plaintiff had engaged in appropriate treatments and should continue with both her psychiatric and psychological treatment to hopefully decrease the severity of her condition.[106]

In the face of this overwhelming and unanimous medical evidence that Plaintiff suffered from a mental impairment that precluded her from doing her specific job as a hospital account manager with Quest Diagnostics, Defendant nonetheless rejected her claim.

The Court finds Defendant's decision to be plagued with multiple errors. First, Defendant neglected to clearly apply the proper definition of "Disability" to Plaintiff's claim. As noted above, "[d]isability" under the Plan is characterized by an inability to perform "the material duties" of the claimant's "Regular Occupation." The Third Circuit has held that the assessment of a claimant's inability to "perform the material duties of his/her regular occupation" requires consideration of the "usual work that the insured is actually performing immediately before the onset date of disability."[107] Failure to consider evidence of Plaintiff's specific, actual job responsibilities or duties is an abuse of discretion.[108] Despite these legal precepts, Defendant never attempted to either enumerate the extent of Plaintiff's "material duties" or seek an opinion

---

[105] Id. at 000591.

[106] Id. at 000591–92.

[107] Lasser v. Reliance Standard Life Ins. Co., 344 F.3d 381, 386 (3d Cir. 2003); see also Miller v. Am. Airlines, 632 F.3d 837, 854 (3d Cir. 2011) ("[I]t is essential that any rational decision to terminate disability benefits under an own-occupation plan consider whether the claimant can actually perform the specific job requirements of a position.").

[108] Elms v. Prudential Ins. Co. of Am., No. Civ.A.06-5127, 2008 WL 4444269, at *16 (E.D. Pa. Oct. 2, 2008).

from a vocational expert.[109]  Moreover, in the face of multiple medical opinions detailing Plaintiff's precise functional limitations and what specific duties Plaintiff could not perform due to her condition, Defendant never explained how Plaintiff's condition was otherwise consistent with her capability to satisfactorily continue in her employment.  Absent some connection between Plaintiff's abilities and her specific job requirements, the Court must infer that Defendant misinterpreted the Plan and imposed on Plaintiff a more rigorous standard that required her to prove disability from all employment.

Second, Defendant's written denial letter never acknowledged the existence of Dr. Wolanin's opinion, let alone offered an explanation for why his conclusions were not entitled to significant weight in the disability determination.  Dr. Wolanin was explicit in his medical opinion—based on the multiple diagnostic tests, a review of records, and an interview with Plaintiff—that Plaintiff had job performance-specific disabilities.  Yet, Defendant failed to consider and justify rejection of this conclusion.  Even in its summary judgment papers, Defendant only cursorily mentions Dr. Wolanin and, even then, never attempts to explain why his opinion was silently dismissed in the disability determination.[110]  "An administrator may not selectively consider and credit medical opinions without articulating its thought processes for doing so."[112]

---

[109]  The record contains sporadic notations that Plaintiff's job as a Hospital Account Manager is a "sedentary" position and is described as "office and clerical."  (A.R. 000163, 000261, 000274.)  These descriptions, however, refer only to the physical demands of her job and do not shed any light on the mental demands—a crucial omission given that her alleged disability is psychological in nature.

[110]  The only mention of Dr. Wolanin's opinion in Defendant's Motion for Summary Judgment is in paragraph forty-three of the statement of facts, which states that "Plaintiff was referred to Dr. Wolanin for an assessment by new counsel's office, and Dr. Wolanin is not a treating physician."  (Def.'s Mot. Summ. J. ¶ 43.)

[112]  Ricca v. Prudential Ins. Co. of Am., 747 F. Supp. 2d 438, 445 (E.D. Pa. 2010).

Third, Defendant rendered its decision in this matter after only a "paper review" of Plaintiff's claim.  "Where the plan at issue specifically provides a plan administrator with the authority to request an independent medical examination, the failure of the plan administrator to procure such an examination before denying a particular claim may 'raise questions about the thoroughness and accuracy of the benefits determination.'"[113]  "[A] decision to forego an IME and conduct only a paper review, while not rendering a denial of benefits arbitrary *per se*, is another factor to consider in the Court's overall assessment of the reasonableness of the administrator's decision-making process."[114]  Courts have expressed concern where an administrator denies a claim in reliance on reports from paper-review consultants that contradict the treating and examining physicians' consistent and concurring opinions that the claimant is disabled.[115]

In this case, the Plan provided that the insurance company may require "a medical examination of the Insured at its own expense.[116]  Notwithstanding that authority and the fact that Plaintiff's claimed disability was psychological in nature, Defendant never requested such an

---

[113]  Haisley v. Sedgwick Claims Mgmt. Servs., Inc., 776 F. Supp. 2d 33, 49 (W.D. Pa. 2011) (noting that "the failure to procure such an examination may be unreasonable where the specific impairments or limitations at issue are not amenable to consideration by means of a file review") (quoting Calvert v. Firstar Fin., Inc., 409 F.3d 286, 295 (6th Cir. 2005)).

[114]  Schwarzwaelder v. Merrill Lynch & Co., Inc., 606 F. Supp. 2d 546, 559 (W.D. Pa. 2009).

[115]  See, e.g., Elms, 2008 WL 4444269, at *18 (characterizing administrator's selective use/interpretation of reports as a "procedural irregularity" and observing that "[it was] important to note that no doctor who ha[d] actually treated [plaintiff] or examined her in person, as opposed to performing a 'file review', ha[d] found her to be capable . . . of performing her work-related tasks"); Winkler v. Metro. Life Ins. Co., 170 F. App'x 167 (2d Cir. 2006) (vacating decision as arbitrary where it was based "entirely on the opinions of three independent consultants who never personally examined [plaintiff], while discounting the opinions" of the treating and examining physicians who assessed psychiatric disability).

[116]  A.R. 000769.

examination.  Rather, in connection with Plaintiff's original claim, Defendant (1) interviewed

Plaintiff who described her disability; and (2) had two telephone conversations with Dr.

Wittman, who confirmed Plaintiff's inability to return to work.  Thereafter, during the various

appeals, Defendant's only consideration of her case was a paper review consisting of letters,

assessments, and progress notes from Drs. Wittman and Herman, all opining that Plaintiff was

disabled.  As of the last appeal, Plaintiff had submitted the additional assessment from Dr.

Wolanin.  Defendant still denied Plaintiff's claim based upon paper reviews by an Appeal Senior

Associate, a Nurse Case Manager, and psychiatrist Rafael Ruiz, M.D.  Notably, Dr. Ruiz never

spoke with Plaintiff or her treating providers and apparently did not consider Dr. Wolanin's

report or the fact that multiple psychological assessments substantiated the opinions of Drs.

Herman and Wittman.[117]  "[W]here the insured's treating physician's disability opinion is

unequivocal and based on a long term physician-patient relationship, reliance on a

non-examining physician's opinion premised on a records review alone is suspect and suggests

that the insurer is looking for a reason to deny benefits."[118]

    Fourth, a review of what Defendant claims to be "abundant documentation contained in

the notes of [the] treating physician[s] which contradict their expressed opinions," reveals an

improperly selective reading of the evidence.[119]  It is well settled that "[c]rediting one portion of a

---

[117]  Defendant argues that Dr. Ruiz considered Dr. Wolanin's opinion.  The record, however, reflects
otherwise.  Dr. Ruiz listed the precise pieces of evidence he considered by provider and date.  Dr. Wolanin's report
is conspicuously absent from that list.  (A.R. 000021.)

[118]  Morgan v. The Prudential Ins. Co. of Am., 755 F. Supp. 2d 639, 647 (E.D. Pa. 2010).

[119]  Def.'s Mem. Supp. Mot. Summ. J. 10.

report and rejecting others is further evidence of arbitrary and capricious behavior."[121]  "An

administrator cannot selectively parse out information."[122]  Notwithstanding this well-settled

principle, Defendant repeatedly engaged in "cherry-picking" of the evidence:

- Defendant relied on a notation from Dr. Herman on September 5, 2013, that Plaintiff had discontinued her Wellbutrin and felt that her dog was providing more relief than the medicine.  Defendant, however, failed to cite the August 14, 2013 notation that Wellbutrin was making Plaintiff shaky, and the September 5, 2013 notation that she did not like it.[123] Defendant also neglected to reference the remainder of the September 5, 2013 notation where Plaintiff reported doing "horribly," was seeking a therapist, had depressed mood and tearful affect, and was continuing on other medications including Lexapro and Valium.[124]  Dr. Wittman noted that Plaintiff's dog is a part of her therapy to decrease her anxiety, and she would not be allowed to have her dog near her in a workplace.[125]

- Defendant commented that, in November 2013, Plaintiff had the ability to "plan for support and how to manage the holidays."  Dr. Wittman's treatment notes, however, reflect that Plaintiff's "planning" was indicative of her grief as it was about "avoidance not celebration."[126]  Indeed, notations over the course of four sessions in November 2013 reveal that Plaintiff was "consumed [with] hopelessness as the holidays approach," could not switch gears to think about developing new celebratory traditions as opposed to just getting through the days, was pushed "to the edge" by the pressure to share in others' joys, felt constant fatigue due to her continued focus on getting through the holidays, and experienced exacerbated symptoms of grief.[127]

---

[121]  Porter v. Broadspire & Comcast Long Term Disability Plan, 492 F. Supp. 2d 480, 491 (W.D. Pa. 2007) (citing Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 393–94 (3d Cir. 2000)); see also Holmstron v. Metro. Life Ins. Co., 615 F.3d 758, 777 (7th Cir. 2010) (holding that "selective readings" of the evidence that are "not reasonably consistent with the entire picture" are "another hallmark of an arbitrary and capricious decision").

[122]  Porter, 492 F. Supp. 2d at 491 (citing Petroff v. Verizon North, Inc. Long Term Disability Plan, No. Civ.A.02-318, 2004 WL 1047896, at *14 (W.D. Pa. May 4, 2004) (stating that a selective review of medical evidence demonstrates an arbitrary and capricious denial)).

[123]  A.R. 000620–21.

[124]  Id. at 000620.

[125]  Id. at 000578, 000625; see also id. at 000700 (notation by Dr. Herman that Plaintiff suffers anxiety being away from dog for too long).

[126]  Id. at 000630.

[127]  Id. at 000629–30.

- As evidence of her lack of disability, Defendant cited the fact that Plaintiff planned a trip to her sister's home in Florida in early 2014.  It failed, however, to mention that the trip was not recreational, but rather was taken at Dr. Wittman's repeated urging in an effort to help Plaintiff cope with her isolation.[128]  Dr. Wittman noted that Plaintiff was "very anxious" about the trip because Plaintiff felt like she was abandoning her son.[129]  Additionally, Defendant did not mention the fact that Plaintiff continued her sessions with Dr. Wittman by video conferences, and that she suffered anxiety being away from her son's belongings.[130]

- Defendant asserted that the fact that Plaintiff performed her job for five years after the death of her son contradicts the finding of disability.  Defendant again, however, disregarded Dr. Wittman's notation that Plaintiff "had a very supportive and protective boss who overlooked her diminishing professionalism.  In 2013, this boss left and under the new management she was unable to conceal her functional limitations."[131]  Moreover, Dr. Wittman reported that Plaintiff's anxiety was becoming more debilitating and rendering her increasingly incapable of performing her job.[132]

- Defendant remarked that the doctors' frequent notations of Plaintiff's good insight, judgment, and cognition are inconsistent with an individual who is disabled due to grief and anxiety.  Yet, in these same notations, Plaintiff was consistently described as having a tearful and anxious affect and a depressed mood.  The doctors' letters indicate that these latter symptoms—her depression, hopelessness, anxiety, and complicated grief—are what interfered with her ability to work, and not her lack of insight, judgment, or cognition.

- Defendant relied on the fact that Plaintiff was reported to be active in the nonprofit she started in her son's memory, and in mentoring others at a support group.  As Dr. Wittman remarked, however, these activities may not have been entirely positive and may have been "another way to stay with [Plaintiff's] all consuming grief."[133]  In other words, Plaintiff remained engaged with activities that allowed her to remained focused on her son's death and her related despair.  Such activities do not reflect the ability to engage in unrelated work that requires her to focus on something other than her grief.

---

[128] Id. at 000629.

[129] Id.

[130] Id.

[131] A.R. 000572.

[132] Id. at 000632–33.

[133] Id. at 000627.

In short, Defendant selectively isolated statements from the medical documents in an effort to reach a decision contrary to that of Plaintiff's treating and examining medical providers.  When read in context, those same statements actually bolster and support the three unequivocal medical opinions that Plaintiff's depression, anxiety, and Complex Bereavement Syndrome render her disabled from her prior position at Quest.

Having reviewed the entirety of the record, the Court concludes that the medical evidence compels a finding that Plaintiff was disabled as defined in the Plan.  Both treating providers expressly opined—based on their well-documented, longitudinal observations—that Plaintiff could not return to work.  The consultative psychologist concurred after a full examination, review of the record, and a battery of psychological assessments.  Defendant relied on unreasonable inferences made from isolated and out-of-context notations in the medical record, an incomplete paper review by a psychiatrist who never examined Plaintiff, and a lack of information about Plaintiff's job demands.  Under the de novo standard of review that properly applies to this case, the Court must find that Defendant incorrectly denied Plaintiff's entitlement to disability benefits under the Plan.   Indeed, the errors are so extensive that the Court would reach the same result under the more deferential arbitrary and capricious standard.

## C.  <u>Appropriate Remedy</u>

In an ERISA benefits case, a court has discretion in fashioning a remedy.[134]  Upon finding that a plan administrator has not reached a correct decision under a de novo standard, a court may either remand the case to the administrator for a re-evaluation of the claim or retroactively award

---

[134]  <u>Carney v. Int'l Bhd. of Electrical Workers Local Union 98 Pension Fund</u>, 66 F. App'x 381, 385–87 (3d Cir. 2003).

benefits.[135]   In crafting a remedy, however, the Court must remain cognizant of the fact that

ERISA promotes the interests of employees and other plan beneficiaries by protecting employees'

contractually defined benefits.[136]   "Allowing a plan administrator another opportunity to re-

enforce its conclusion after many months and several layers of administrative proceedings during

which it had ample time to conduct the necessary evaluation would undermine these underlying

policies of ERISA."[137]   Thus, remand is unnecessary where the claimant would have received

benefits had the correct review been performed.[138]

Here, Defendant did not misinterpret the Plan, apply the wrong standard, or act on an

incomplete medical record.  Instead, Defendant repeatedly failed to fully and fairly consider the

medical record as a whole; had Defendant done so, Plaintiff would have received benefits.

Therefore, remand is unwarranted in this case and Plaintiff is entitled to summary judgment on

her claim for benefits.[139]

### D.      Attorney's Fees

Section 502(g)(1) of ERISA provides that "[i]n any action under this subchapter . . . by a

participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's

---

[135]   Cook v. Liberty Life Assur. Co. of Boston, 320 F.3d 11, 24 (1st Cir. 2003).

[136]   See McLeod v. Hartford Life & Acc. Ins. Co., 372 F.3d 618, 624 (3d Cir. 2004) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989)).

[137]   Addis v. Limited Long Term Disability Program, 425 F. Supp. 2d 610, 620–21 (E.D. Pa. 2006) (citing Carney, 66 F. App'x 381, 386–87 (further citations omitted)).

[138]   Miller v. Am. Airlines, Inc., 632 F.3d 837, 856 (3d Cir. 2011).

[139]   The Court notes that the only benefits at issue are those in the short-term disability plan; no issues relating to whether Plaintiff would be entitled to long-term disability benefits are currently before the Court.

fee and costs of action to either party."[140]  In determining whether a party is entitled to such fees, a court must consider the following factors: (1) the non-prevailing party's bad faith or culpability; (2) the ability of that party to satisfy an attorney's fee award; (3) the deterrent effect of such award on that party; (4) the benefit conferred on members of the plan as a whole; (5) the relative merits of the parties' positions. [141]

In this case, the Court finds that all but the fourth factor, which is neutral, weigh in favor of an award of fees.  As set forth in detail above, the medical record was unambiguous as to Plaintiff's inability to perform her previous occupation, and Defendant's strenuous efforts to conclude otherwise evidence a bad faith review under the first factor.  Under the second factor, there is no argument that Defendant could not satisfy a fee award.  As to the third factor, the Court reasonably expects that an award of fees in this case may have a deterrent effect on such inadequate and one-sided reviews in ERISA disability benefit cases by this insurer.  Finally, under the fifth factor, the Court finds that Defendant's denial of Plaintiff's short-term disability benefits had no merit, causing Plaintiff to endure financial hardship and strains on her already compromised mental condition.  Considered together, these factors support an award of  fees.

## IV.   CONCLUSION

In light of the foregoing, the Court grants Plaintiff's Motion for Summary Judgment in its entirety and denies Defendant's Motion for Summary Judgment, and will grant attorney's fees upon the filing of an appropriate petition.  An order will be entered.

---

[140]  29 U.S.C. § 1132(g)(1).

[141]  Hahnemann Univ. Hosp. v. All Shore, Inc., 514 F.3d 300, 310 (3d Cir. 2008) (citations omitted).